**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)**

| | | |
|---|---|---|
| In re: | § | **Chapter 11 (Subchapter V)** |
| | § | |
| **Flix Brewhouse NM LLC,** | § | **Case No. 21-30676 (HCM)** |
| | § | |
| Debtor. | § | |
| | § | |

**DECLARATION OF ALLAN L. REAGAN IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION &
FIRST DAY RELIEF**

I, Allan L. Reagan, declare under penalty of perjury, that:

1.      I am the President of Hospitality Investors, Inc., which is the Manager of Flix Brewhouse NM LLC, the debtor and debtor in possession (the "***Debtor***" or "***Flix ABQ***") in the above-captioned Chapter 11 case (the "***Case***"). I am over 18 years of age, and I am competent to testify.

2.      The Debtor filed a voluntary chapter 11 petition on September 10, 2021 (the "***Petition Date***"). (Dkt. 1). The Debtor continues to manage its financial affairs as debtor in possession. The Debtor elected for this Case to proceed under Subchapter V of chapter 11, as discussed in greater detail in this Declaration.

3.      The Debtor has requested certain relief in "first day" motions filed with the Court (the "***First Day Motions***") to minimize potential adverse effects of the bankruptcy filing and to maximize the value of its estate. I submit this Declaration (the "***Declaration***") to assist the Court and parties in interest in understanding the circumstances that led to the commencement of the Case and in support of the Debtor's voluntary petition and First Day Motions.

4.      Except as otherwise indicated in this Declaration, all facts set forth here are based upon my personal knowledge, my review of relevant documents including the First Day Motions and their exhibits, and my opinion based on my experience and knowledge. If called upon to testify, I would testify competently to the facts set forth in this Declaration, and I am authorized to submit this Declaration on behalf of the Debtor.

5.      The relief sought in the First Day Motions is necessary to avoid immediate and

irreparable damage to the Debtor's business and will provide an orderly transition of the Debtor into this Case, and ultimately facilitate the Debtor's ability to reorganize, thus maximizing recoveries for all parties in interest. Further, I believe the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals identified above, and accordingly, best serve the interests of the Debtor's estate.

6.      I additionally disclose that I am currently a debtor and debtor in possession in an individual Chapter 11 case proceeding under Subchapter V of Chapter 11 of the Bankruptcy Code, pending in this District (Austin Division) captioned *In re Allan L. Reagan*, Case No. 20-11161-tmd (the "***Reagan Case***"). I filed the Reagan Case on October 22, 2020 and have confirmed a plan of reorganization.

7.      Further, one of the Debtor's affiliates, Flix Brewhouse Texas V LLC ("***FB Texas V***"), is a Chapter 11 debtor and debtor in possession, and its case is pending before this Court, captioned *In re Flix Brewhouse Texas V LLC*, Case No. 21-30526-hcm. The FB Texas V case was filed on July 12, 2021, although the decision has been made to seek to dismiss the FB Texas V chapter 11 case.

I.    OVERVIEW OF THE DEBTOR & ITS BUSINESS

A.  The Debtor's Business & Capital Structure History

8.      Flix ABQ is located in the Village @ La Orilla shopping center in Albuquerque, New Mexico (the "***Premises***") where it operates as "Flix Brewhouse" and operates a 37,557 square foot entertainment and dining venue that includes an eight screen luxury dine-in movie theater showing first-run films, a lounge and a craft microbrewery producing Flix Brewhouse-branded beer.

9.      Flix ABQ is a New Mexico limited liability company and a wholly owned subsidiary of Flix Brewhouse Holdco LLC ("***Holdco***"), which in turn is a wholly owned subsidiary of Flix Entertainment LLC ("***FELLC***"). FELLC in turn owns eight other direct and indirect subsidiary entities that operate existing Flix Brewhouse locations across the Southwestern and Midwestern

United States, several of which have been recently reopened, and others of which are in the process of reopening as follows:

| Location | Operating Entity | Reopening Status |
|---|---|---|
| Carmel, Indiana | Flix Brewhouse Indiana LLC | TBD: target October 22, 2021 |
| Des Moines, Iowa | Flix Brewhouse Iowa LLC | Reopened August 5, 2021 |
| El Paso, Texas | Flix Brewhouse Texas V LLC | Reopening September 23, 2021 |
| Frisco/Little Elm Texas | Flix Brewhouse Texas II LLC | TBD: target November 11, 2021 |
| Madison, Wisconsin | Flix Brewhouse WI LLC | Reopened September 2, 2021 |
| Oklahoma City, Oklahoma | Flix Brewhouse Oklahoma LLC | Reopened June 24, 2021 |
| Round Rock, Texas | Flix Brewhouse LLC | Reopened June 24, 2021 |
| San Antonio, Texas | Flix Brewhouse SAT LLC | Reopened June 24, 2021 |

10.     Flix ABQ began operating at the Premises in November 2017 under the terms of that certain Commercial Real Estate Lease dated August 18, 2015 (the "***Lease***") between the Debtor as tenant and Village @ La Orilla, LLC as landlord (the "***Landlord***").

11.     Flix ABQ's debts, as of the Petition Date, include:

(a) A noncontingent, liquidated secured debts totaling approximately $1.455 million in connection with a secured SBA loan from Comerica Bank.

(b) Approximately $61,903 in noncontingent, liquidated unsecured debts owed to general unsecured creditors.

(c) Unliquidated, disputed debt owed to the Landlord for rent and other amounts under the terms of the Lease, reflected on the Debtor's books and records in the approximate amount of $184,063.5.[1]

---

[1] This amount is both disputed and unliquidated because, among other reasons, *force majeure* conditions in existence for the entire Shutdown Period excused the Debtor from paying rent under the Lease's *force majeure* provisions; and (b) because the amounts owed by the Debtor under the Lease for the Shutdown Period have not been agreed to between the Debtor and the Landlord and this issue has not yet been adjudicated before a court with jurisdiction to do so. If the Landlord held a noncontingent, liquidated claim against the Debtor for past-due rent amounts on the Petition Date, the approximate amount of the Landlord's claim would be $1.497 million, which, when added to the aggregate noncontingent, liquidated debts of the Debtor and its affiliates, would be approximately $7.06 million, more than $400,000 below the Sub V debt threshold.

12.     On September 10, 2021, the Debtor both filed its chapter 11 petition and announced its intention to reopen for business on September 30, 2021. The public response to the reopening the Debtor's two Facebook posts announcing this was overwhelming. Within 24 hours the posts garnered over 2,500 likes and over 1,000 comments (including coverage of the announcement by all three local television news outlets), typified by these examples:

> Yea!! We will go even if there isn't (sic) any good movies out. Seriously it's about enjoying the great food/drinks and spending time with friends and family. We miss you dearly and hope you open soon.
> -   N. Moses, 09/10
>
> This [announcement] made my day!!!! I hyped up this theater so much people thought I worked there. Love the food, the service, the rewards program, and the local beer selection! Hands down, THE BEST MOVIE EXPERIENCE in NM!!!!
> -   R. Garcia, 09/11
>
> I cannot describe how happy this makes me. I cannot go to a movie without enjoying a good meal. We will support your theatre with our $$. THANK YOU!!!!!
> -   M. Hansen, 09/11

13.     This response is unsurprising, as Flix ABQ has been repeatedly voted Albuquerque's favorite movie theater by the readers of multiple local publications.

14.     Not only is Flix the only dine-in cinema operator in the entire state, but it offers a depth of special interest programming, both film and non-film, that stands out from the typical movie theater multiplex. The purpose of Flix for existing is to create and share happiness. Our staff bring that purpose to life every day and in so doing they forge deep emotional bonds with our guests.

15.     Prior to shuttering because of the Pandemic, between 140 and 190 New Mexicans were active team members at Flix ABQ.  In 2019, nearly $2.5 million of payroll and benefits were paid out on account of this single location.

16.     Flix ABQ has been closed since March 16, 2020 – a year and a half.

17.     After the reopening announcement, all six of Flix ABQ's former salaried managers who were laid off when the Pandemic first struck made the decision to quit their current jobs and

4

come back to work at Flix ABQ. In addition, three dozen former hourly team members have already made a commitment to rejoin.

18.     Although it is unlikely that Flix ABQ will regain full pre-Pandemic employment figures in the near term, it is likely that more than 100 people will be full or part-time employed at Flix ABQ before the end of 2021.

19.     For the sake of clarity, the Debtor does not directly employ anyone. Rather, all staff are employed by Cinema Breweries, Inc. ("***CBI***"), a wholly owned subsidiary of the Debtor's Manager, Hospitality Investors, Inc. CBI provides staff members to the Debtor under a Staffing Services Agreement dated December 29, 2017.

20.     Flix ABQ is also a party to various licensing and rental agreements with major movie studios and providers of certain items of machinery and equipment and is the holder of various licenses and permits issued by the State of New Mexico and Bernalillo County such as alcoholic beverage licenses and small brewer's permit.  The brewery is also subject to licensing and bonding requirements from the Federal Tax and Trade Bureau. Its critical licenses and permits have been renewed in contemplation of reopening.

21.     Flix ABQ owns furniture, fixtures, and equipment ("***FF&E***") located at the Premises including, among other things, luxury theater seating, film projectors, screens, sound systems, and brewery and restaurant equipment. Comerica has a properly perfected first priority lien on all of Debtor's FF&E.

**B. The Debtor's Subchapter V Election**

22.     The Debtor, as I noted above, is an affiliate of two other chapter 11 debtors: myself and FB Texas V, as defined by Bankruptcy Code § 101(2).[2]

23.     Under the terms of the confirmed Second Amended Plan of Reorganization in the

---

[2]     I am an affiliate of the Debtor because I directly or indirectly own more than 20% of the outstanding voting securities of FELLC, the Debtor's ultimate parent entity, which is the 100% owner of Holdco, the Debtor's sole member. *See* 11 U.S.C. § 101(2)(A). Flix Brewhouse Texas V LLC is an affiliate of the Debtor by virtue of their "horizontal affiliation," through their common parent entity, FELLC. *See* 11 U.S.C. § 1012(B), *see also In re Reichmann Petroleum Corp.*, 364 B.R. 916, 921 (Bankr. E.D. Tex. 2007).

Reagan Case (Reagan Dkts. 165, 179), the total amount owed to creditors in the Reagan Case is approximately $3,020,253. FB Texas V's aggregate noncontingent, liquidated secured and unsecured debts are approximately $888,127.[3]

24.    The aggregate noncontingent, liquidated, secured and unsecured debts of all three affiliated debtors is therefore calculated as approximately $5,630,108.88, falling more than $1.86 million below the $7.5 million threshold set forth in § 1182(1)(B)(i). The Debtor thus determined that it was therefore eligible to elect for this Case to proceed under Subchapter V of the Bankruptcy Code.

## II.    EVENTS LEADING TO THE DEBTOR'S BANKRUPTCY FILING & GOALS FOR THE CASE

25.    Since March 2020, the Debtor has been unable to operate its business at the Premises due to the effects of the COVID-19 global pandemic (the "***Pandemic***"). The Pandemic led to the issuance of governmental orders, laws, and other regulations applicable to the Premises, such as occupancy and spacing limits in a theater and auditorium spaces, and mandates that the Debtor could not conduct its business at the Premises.

26.    Now, however, through a combination of government grant funding through the SVOG program (discussed below) and improved business conditions, the Debtor will seek to restart its business operations and reorganize its business in chapter 11.

### C.  COVID-19's Effects on the Debtor's Operations

27.    In addition to the governmental orders restricting or preventing the Debtor's operations, health authorities such as the United States Centers for Disease Control, the World Health Organization and myriad state and local health officials warned consumers to avoid indoor gathering places, particularly places of mass entertainment such as the Premises.

28.    The combination of governmental restrictions and consumer reluctance to attend

---

[3]    As reflected in its bankruptcy schedules and statement of financial affairs, FB Texas V's aggregate noncontingent, liquidated secured and unsecured debts were approximately $289,585 as of its petition date. See (FB Texas V Dkt. 32). This amount has increased, however, following the Court's order approving assumption of FB Texas V's amended lease, under which the claim of FB Texas V's landlord is fixed in the amount of approximately $598,542. See (FB Texas V Dkt. 59, 68).

movie theaters severely depressed the global market for out-of-home motion picture entertainment, which in turn resulted in widespread and potentially permanent disruption to the supply of major motion pictures that have traditionally been first-released in movie theaters.

29.     Substantially all of the previously scheduled motion picture releases from mid-March 2020 through March 2021 were postponed, or in many cases cancelled, and distributed directly to consumers via streaming services.[4] Thereafter, motion picture releases have been a mix of postponements, direct to consumer, simultaneous "day and date" releases to home and theaters, and brief exclusive runs (17 days until available direct to consumer).

30.     The Debtor was specifically prevented from operating its business at the Premises beginning in March 2020 on account of New Mexico Governor Grisham's Executive Order 2020-004 declaring a state of emergency in New Mexico and the March 19, 2020, order of the New Mexico Department of Health restricting the number of individuals allowed to congregate in public and private spaces to ten people in total.

31.     On March 23, 2020, the New Mexico Department of Health issued another order (as amended, and collectively referred to with Executive Order 2020-004 as amended, the "***Shutdown Orders***") requiring the complete shutdown of all non-essential businesses in New Mexico, and further restricting the number of people allowed to gather in the same place to five in total.

32.     The Shutdown Orders took immediate effect and was periodically renewed and extended through May 31, 2021 (the "***Shutdown Period***").

33.     Beginning June 1, 2021, theaters in Bernalillo County were permitted to reopen subject to a per-auditorium occupancy limit of 33% of available seating. These occupancy restrictions were gradually phased out by July 1, 2021.

---

[4]     *See* Vulture Editors, *Here Are All the Movies Delayed Because of the Coronavirus — With Some New Release Dates*,   https://www.vulture.com/2021/04/here-are-all-the-movies-and-tv-shows-affected-by-coronavirus.html Vulture.com (last accessed July 20, 2021).

34.     At the outset of the Pandemic, the Debtor made efforts to address its rent obligations to the Landlord, paying its March 2020 rent under the Lease, and tendering various interim partial rent payments through October 2020, even though the Debtor was not able to operate its movie theater business at the Premises during this time period.

35.     Unfortunately, the well-documented Fall and Winter spikes in COVID-19 cases, hospitalizations, and deaths nationally effectively scuttled the entire theater industry's reopening plans. Not only did governmental restrictions stay in place, but in many cases these restrictions were made even more stringent. Likewise, the former movie-going public stayed home. And in response, film distributors accelerated the pace of release date cancellations in favor of direct-to-home distribution and postponements, or so-called "day and date" simultaneous releases.  In New Mexico, the national macro environment impacting the theater business was overshadowed by the continuing and amended Shutdown Orders that absolutely prohibited the operation of any movie theaters.

**D.  COVID-19's Effects on Location-Based Entertainment Concepts**

36.     The Debtor's story is a common one among film exhibitors and other operators of out-of-home entertainment and dining concepts. Nationally, revenues plummeted due to both restrictive governmental orders and consumer avoidance. In New Mexico, indoor movie theater revenues went to zero as a result of the Shutdown Orders.

37.     Movie theaters in particular have been doubly affected by the Pandemic because movie product went elsewhere due to studios and distributors postponing or cancelling theatrical releases, sometimes in favor of distributing films direct to consumers via direct-to-home distribution services. Even those theaters that *could* operate at limited capacity had nothing to show. It was like trying to operate a shoe store that sold only socks and laces.

38.     During this low period, two of the Debtor's better-known competitors, who each chose to attempt to operate in this environment, Studio Movie Grill and Alamo Drafthouse, filed

for bankruptcy protection,[5] as did an Alamo Drafthouse franchisee group[6] and numerous small theater operators. Other notable "hot concepts" in out-of-home entertainment, like Punch Bowl Social[7] and dozens of restaurant groups likewise filed.

39.     The outlook for the Debtor's business today has improved dramatically since the vaccine rollout began and governmental restrictions have eased, but the Pandemic is not over, and audiences have not yet returned to movie theaters in pre-Pandemic numbers. Fortunately, a percentage of the former movie-going population has already or is likely to return post-Pandemic;[8] but early box office sales have had varied success, movie distribution patterns have likely changed permanently, and the supply of content that plays exclusively in theaters as "first run" is greatly diminished following the mixed success of "day and date" distribution models in 2020 and 2021, eroding box office gross sales figures for out-of-home film exhibition.

40.     It is too early to tell the exact permanent diminution of box office revenue as a result, but in a CNBC interview earlier this year I estimated the permanent attendance loss of traditional Hollywood feature films at about 25% compared to a 2018/2019 baseline.

41.     Regardless of these headwinds, I personally believe that affordable luxury dine-in concepts like Flix Brewhouse, with the ability to "eventize" movies and provide unique consumer experiences like an award-winning on-site brewery, have a better chance of surviving long-term than traditional multiplexes playing the same content people can watch at home.  The outpouring of Flix ABQ fans responding to our reopening announcement corroborates that thesis.

---

[5]   *See In re Studio Movie Grill Holdings, LLC, et al.,* Case No. 20-32633-11, (Bankr. S.D. Tex.); *In re Alamo Drafthouse Cinemas Holdings, LLC, et al.,* Case No. 21-10474 (Bankr. D. Del.).

[6]   *See In re Alamo Chandler LLC, et al.,* Case No. 20-05017 (Bankr. D. Ariz.).

[7]   *See In re PBS Brand Co., LLC, et al.,* Case No. 20-13157 (Bankr. D. Del.).

[8]   *See* Rebecca Rubin, *Movie Theaters Slowly Recover, but 2021 Box Office Still Down 81% From Pre-Pandemic Times*, Variety.com (July 6, 2021) https://variety.com/2021/film/box-office/box-office-2021-pre-pandemic-1235010346/; *see also*, Rebecca Rubin, *'Free Guy' Beat Box Office Expectations, but Movie Theaters Still Have a Big Problem*, Variety.com (Aug. 16, 2021) https://variety.com/2021/film/news/free-guy-beat-box-office-expectations-delta-variant-1235041927/.

### E.  The Shuttered Venue Operator Grant Program

42.     During the second half of 2020, various federal legislative relief proposals coalesced under the banners of "Save Our Stages" and "Save Our Screens." After many months of strenuous lobbying, and bipartisan leadership in both the Senate and the House, on December 21, 2020, Congress passed the Shuttered Venue Operators Grant ("***SVOG***") program as part of the Consolidated Appropriations Act 2021, (Pub. L. No. 116-260, Title III, § 324). which became law one week later, making an original pool of $15 billion available to eligible businesses like the Debtor's.

43.     Under the SVOG program, eligible businesses, including movie theaters and movie theater chains, have the ability to be awarded grants equal to 45% of their qualifying 2019 revenues by the United States Small Business Administration (the "***SBA***") to restart their operations and pay specific business expenses including rent obligations, certain payroll costs, utility payments, and numerous other ordinary and necessary business expenses. The funds must be used to restart or continue the specific grantee's business and grant applicants must certify an intent to reopen if not currently open to the public.[9] Additionally, affiliated businesses could submit applications for SVOG grants covering more than one business, which is what FELLC did in this Case.

44.     As was widely reported,[10] despite the intent of the SVOG program to provide emergency relief to eligible applicants, the SBA struggled to get the program running and grant money flowing.

45.     FELLC's SVOG application was submitted to the SBA on April 26, 2021, as part of an application for an affiliated group of businesses that included FELLC, the Debtor's theater, and

---

[9]     *See* sba.gov, *Shuttered Venue Operators Grant*, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/shuttered-venue-operators-grant#section-header-1 (last accessed July 20, 2021).

[10]    *See* Andrew Limbong, *As Grants For Shuttered Venues Trickle Out, Many Owners Are Still Waiting*, npr.org, (June 2, 2021), https://www.npr.org/2021/06/02/1002586773/as-grants-for-shuttered-venues-trickle-out-many-owners-are-still-waiting.

two other Flix Brewhouse theaters under a single application.

46.     FELLC's SVOG application was thankfully granted and funded in August 2020 (the "***SVOG Award***").  FELLC's total SVOG Award was approximately $9.2 million, and among other permissible uses, is intended to help applicants restart and operate their theaters.

47.     Despite receiving the SVOG Award and the Debtor's attempts to negotiate with the Landlord regarding amendments to the Lease, the Landlord has not responded to the Debtor, nor has it engaged in such negotiations, described in greater detail below.

### F.  Attempts to Negotiate with the Landlord to Restructure the Lease

48.     In anticipation that the government restrictions prohibiting the Debtor from operating its business at the Premises would eventually be lifted and consumers would return to theaters, the Debtor sought to engage in negotiations with its Landlord to amend the terms of the Lease in the Fall of 2020. These negotiations did not result in any amendment to the Lease.

49.     On December 3, 2020, the Debtor received a letter from the Landlord asserting that the Debtor was in default under the terms of the Lease, despite the fact that the Shutdown Orders remained in effect, prohibiting the Debtor from operating its business at the Premises. The Landlord did not, however, terminate the Lease at that or at any subsequent time.

50.     In response, I issued a response to the Landlord on the Debtor's behalf on December 8, 2020, rebutting the assertions made in the Landlord's initial letter, and seeking again to negotiate with the Landlord to amend the Lease on terms that would facilitate the Debtor's ability to reopen at the premises (contingent upon receipt of government grant funding and lifting of the Shutdown Orders), and operate under the new economic realities presented for post-Pandemic film exhibition. The Landlord never responded to this correspondence.

51.     Throughout 2021, I kept all Flix Brewhouse landlords updated on the status of the SVOG program, as well as making several economic proposals directly to the Landlord for Flix ABQ to address the impact of COVID restrictions, including the Shutdown Orders, on legacy contract rents. I made numerous attempts to engage with the Landlord and negotiate

amendments to the Lease, including providing detailed presentation materials, term sheets, and eventually proposed lease amendments based on resolutions reached with other Flix Brewhouse Landlords by the end of June 2021.

52.     The Landlord never responded or provided any feedback to the Debtor regarding the various proposals presented to it. Nonetheless, I continued to furnish updates to the Landlord regarding the Debtor, the SVOG program, and the industry, in hopes of getting some sort of informed response from—or entering into a constructive dialogue with—the Landlord to restructure the Lease.

### G.  The Debtor's Goal for this Subchapter V Case

53.     Despite the indirect benefit of FELLC's SVOG award, which gives the Debtor the ability to restart its operations at the Premises, the Landlord's persistent silence (without terminating the Lease) in response to the Debtor's repeated overtures to enter into negotiations to restructure the Lease, created a fraught situation.

54.     In order to make the significant financial and ethical commitments required to reopen, not the least of which is uprooting dozens of people from their current employers with the promise of returning to Flix ABQ, the Debtor needed the protection of the automatic stay to ensure that it could restart its operations at the Premises without the threat of a lockout or other attempts by the Landlord to impede the Debtor's ability to operate its business.

55.     The Debtor ultimately filed this Case, however, to pursue its primary goal in chapter 11: a reorganization of its business under amended Lease terms, that will make it viable for the Debtor to resume operations and continue operating at the Premises.

56.     If, however, the Debtor cannot reach a consensual resolution with the Landlord to restructure the Lease, the Debtor will pursue an alternative reorganization path in this Case.

### III.    FIRST DAY RELIEF

57.     Below is a brief discussion of the Debtor's First Day Motions and an explanation of why such motions are critical to the success of the Case. More detailed descriptions of the facts

pertaining to the Debtor's operations and the bases for the requested relief in each motion can be found in the relevant First Day Motions.

58.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtor, in consultation with its professionals, to ensure the Debtor's immediate operational needs are met, and that the Debtor suffers no immediate and irreparable harm. At all times the Debtor's management and professionals remained cognizant of the limitations imposed on debtors in possession and, in light of those limitations, the Debtor narrowed the relief requested at the outset of this Case to those issues that require urgent relief to sustain the Debtor's operations.

### A.  DIP Financing & Cash Collateral Motion

59.     To restart its operations at the Premises, the Debtor needs immediate access to and use of cash. By this motion (the "***DIP Financing Motion***"). Under the DIP Financing Motion, the Debtor seeks authority to borrow up to $1.5 million from its ultimate parent entity, FELLC (the "***DIP Lender***"), to fund operations as the Debtor reopens the Premises to the public. In addition, and only to the extent necessary, the Debtor seeks authority to use cash collateral of its senior lender, Comerica Bank, to further support such operations as it seeks to reorganize under Subchapter V.

60.     In brief, the terms of the DIP Financing Motion and the relief sought thereunder can be summarized as follows:

(a) ***Advances for Operations***: under the DIP Agreement (defined in the DIP Financing Motion) the Debtor may borrow up to $1.5 million on an interim basis and final basis.  The loan is a revolver.

(b) ***Collateral and Liens***:  In exchange for advancing funds under the DIP Agreement, the DIP Lender shall be granted a superpriority lien on substantially of the Debtor's assets, subject to the following: the lien(s) of Comerica Bank (the "***Prior Permitted Liens***") shall remain senior to the liens of Lender except to the extent that any such Collateral has been generated by or is otherwise the result of post-petition operations, including personal property (such as machinery and equipment)  purchased or obtained by the Debtor using either funds advanced under this facility or the proceeds of post-

13

petition operations. For avoidance of doubt, funds advanced by the DIP Lender to any Debtor account shall be subject to the DIP Lender's priming lien.

(c) ***Interest Rates***: Interest will accrue at 0.86% per annum (the Applicable Federal Rate for September 2021) (the "***Base Rate***"), with default interest to accrue at the Base Rate plus 5%.

(d) ***DIP Fees and Reimbursement***: the DIP loan has an origination fee of $15,000. The DIP Lender will also be entitled to reimbursement of legal fees and costs incurred in connection with protecting or enforcing its rights under the DIP Agreement.

(e) ***Superpriority Claim for Advances***: In addition to a priming lien as described above, the DIP Lender shall be granted a superpriority administrative claim to the extent of outstanding advances on the DIP loan.

(f) ***Maturity***: DIP loan will mature 180 days from the Petition Date, unless extended by agreement and/or by order of court.

(g) ***Events of Default***: The DIP Agreement provides the typical defaults for a loan of this type.

61.     Accessing cash under the terms of the DIP Agreement is essential for the Debtor to operate during this Case. I therefore believe that immediate authority to obtain the DIP loan is necessary to prevent immediate and irreparable harm to the Debtor's estate, and that the relief sought in the DIP Financing Motion is necessary and in the best interests of the Debtor and its bankruptcy estate.

**B. Cash Management Motion**

62.     By this motion (the "***Cash Management Motion***"), the Debtor seeks an order authorizing it to, in the ordinary course of business, (a) use its existing cash management system on a modified basis, certain prepetition bank accounts, and prepetition business forms (without reference to the Debtors' status as a debtor in possession); (b) perform intercompany transactions; (c) direct the Debtor's banks and financial institutions to maintain, service, and administer the Debtor's bank accounts and to the extent funds are available, honor and process all related checks and electronic payment requests consistent with the relief requested therein; and (d) waive the Debtor's compliance with the guidelines set forth in Bankruptcy Code § 345(b).

63.     As described more fully in the Cash Management Motion, the Debtor operates its business under an established cash management system which it utilizes to collect, manage, and disburse funds used in the Debtor's operations in the ordinary course of business, which the Debtor proposes to modify by opening a debtor in possession bank account maintained at Comerica Bank (the "***Comerica DIP Account***") which the Debtor proposes to use as its main operating account in this Case.

64.     The existing Cash Management System (defined in the Cash Management Motion), including use of the cash and credit card receipts depository accounts and intercompany transfers, as supplemented by the Comerica DIP Account, will allow the Debtor to efficiently handle receivables, pay vendors, fund payroll to its payroll affiliate, maintain insurance, pay taxing authorities and regulatory entities, and maintain appropriate reserves for taxes and other business-related obligations.

65.     In my opinion, requiring the Debtor to alter its Cash Management System other than with respect to establishing the Comerica DIP Account as its main funds repository and disbursement account, would cause disruption in the Debtor's business and would impair the Debtor's efforts to maximize the value of its estate. Moreover, such actions would be expensive, unnecessary, and burdensome to the Debtor's estate, and disruptive to the Debtor's business operations, while simultaneously conferring no benefit to parties dealing with the Debtor.

66.     In particular, the Debtor is preparing to reopen in Albuquerque imminently. It will be generating new sales in the process. Being forced to change initial depository accounts for credit card and cash and currency receipts and being disrupted in the ability to process minor disbursements locally would disrupt these activities at a time when they are so critical to the Debtor's very survival. For these reasons, the relief in the Cash Management Motion is necessary to avoid immediate and irreparable damage to the business.

67.     Consequently, I believe that maintaining the Debtor's existing Cash Management System with the addition of the Comerica DIP Account, and other banking and business practices

during this Case is necessary and in the best interests of the Debtor and its bankruptcy estate.

### C. Customer Programs Motion

68.     By this motion (the "***Customer Program Motion***"), the Debtor seeks an order authorizing it to, in the ordinary course of business, continue its customer loyalty and gift card programs, among other things.

69.     The Debtor has historically provided gift cards, coupons, discounts, and other accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtor's business and the value of its brand.

70.     The Debtor maintains gift card programs (the "***Gift Card Program***") pursuant to which customers can purchase pre-paid, non-expiring gift cards, unexpired passes, and vouchers in various denominations (the "***Gift Cards***").

71.     The Debtor maintains a liability on its books and records for unredeemed Gift Cards until redemption as they do not expire. The Gift Cards are not redeemable for cash and thus will not require any cash outlay by the Debtor.

72.     In addition to the Gift Card Program, the Debtor offers discounts to customers through its customer loyalty program "the circle." (the "***Loyalty Program***"). Through the Loyalty Program, participating customers earn points on purchases from the Debtor which can later be redeemed at the Debtor's theater; promotional discounts for joining the Loyalty Program; discounts on Flix Brewhouse merchandise; and periodic promotions for Loyalty Program members. Although points under the Loyalty Program typically expire, the Debtor has frozen the expiration of Loyalty Program points until December 31, 2021.

73.     I believe that maintaining the Debtor's Customer Programs (as defined in the Customer Program Motion) during this Case is necessary and in the best interests of the Debtor and its bankruptcy estate.

## CONCLUSION

74.     For the reasons stated here and in each of the First Day Motions, filed concurrently or in connection with the commencement of this Case, I request that each First Day Motion be granted in its entirety, together with any other, further relief the Court deems appropriate under the circumstances.

[Signature Page Follows]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Amended and Restated Declaration, the foregoing is true and correct.


Date: September 15, 2021                    /s/ Allan L. Reagan

                                            Allan L. Reagan, President
                                            Hospitality Investors, Inc.
                                            the Debtor's Manager