# Exhibit A

# FIRST AMENDMENT TO COMMERCIAL REAL ESTATE LEASE

This First Amendment to Lease (this "**First Amendment**") is made and entered into as of August 26, 2022, by and between Village @ La Orilla, LLC, a Delaware limited liability company ("**Landlord**") and Flix Brewhouse NM LLC, a New Mexico limited liability company d/b/a Flix Brewhouse ("**Tenant**," referred to collectively with the Landlord as the "**Parties**").

## Background

A. Landlord and Tenant entered into that certain "Shopping Center Lease" dated as of August 18, 2015 (the "**Lease**,") to lease certain premises located at the development known as Village @ La Orilla (the "**Center**") in Albuquerque, New Mexico, as more particularly described in the Lease (the "**Premises**").

B. The Lease was guarantied by Flix Entertainment LLC (the "**Corporate Guarantor**") under the terms of a Corporate Guaranty to Lease dated August 14, 2015 (the "**Corporate Guaranty**") and Allan L. Reagan (the "**Personal Guarantor**," referred to collectively with the Corporate Guarantor as the "**Guarantors**") under the terms of a Personal Guaranty to Lease dated August 14, 2015 (the "**Personal Guaranty**").

C. The Personal Guarantor filed a chapter 11, subchapter V bankruptcy case before the United States Bankruptcy Court for the Western District of Texas, captioned *In re Allan L. Reagan*, Case No. 20-11161-tmd. The Personal Guarantor confirmed a plan of reorganization in his personal bankruptcy case, and distributions from the Personal Guarantor's bankruptcy estate to the Landlord on account of the Personal Guaranty totaled $255,538.73 (the "**PG Payment**"). An *Order Granting Reorganized Debtor's Motion for Entry of Order Granting Discharge* was entered in the Personal Guarantor's bankruptcy case on January 26, 2022, discharging the Personal Guarantor of his liabilities under the Personal Guaranty.

D. The effects of the COVID-19 global pandemic (the "**Pandemic**") declared by the World Health Organization on March 11, 2020 which led to the issuance of governmental orders, laws or regulations that may have been applicable to the Premises and/or the Center, such as (by example only) closing movie theaters, and mandating that tenants may not conduct permitted uses within their premises, or limiting occupancy in a given space (*e.g.*, an auditorium) (the "**Government Restrictions**").

E. The use of the Premises was subject to full or partial Government Restrictions from March 12, 2020 through June 30, 2021 (the "**Force Majeure Period**"). In

    addition to payment in full of rent for March 2020, the Parties acknowledge that Tenant paid a total of $30,000.00 on its rent account (the "**Partial Rent Payment**") during the remainder of the Force Majeure Period.

F. Tenant did not operate its Permitted Use at the Premises from March 17, 2020 through September 29, 2021, and reopened at the Premises operating its Permitted Use on September 30, 2021.

G. On September 10, 2021, the Tenant filed a voluntary chapter 11 bankruptcy proceeding (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Western District of Texas (the "**Bankruptcy Court**"). The Bankruptcy Case is pending under case number 21-30676-hcm, and Tenant elected for the Bankruptcy Case to proceed under subchapter V of chapter 11.

H. On November 19, 2021, the Landlord filed a proof of claim in the Bankruptcy Case, identified in the claims registers as claim number 7 (the "**Proof of Claim**"). The Proof of Claim alleges that the Landlord is owed $1,482,563.40 by Tenant on account of rent and other charges under the Lease, inclusive of certain interest, fees, and other expenses for the Force Majeure Period and the months of July 2021 through September 2021.

I. Tenant disputes the Proof of Claim including, among other things, the amounts alleged by Landlord and Landlord's assertion that it holds a valid lien upon Tenant's personal property.

J. On December 1, 2021, the Tenant and the Corporate Guarantor as co-plaintiffs, filed an adversary proceeding in the Bankruptcy Court (the "**Adversary**") against the Landlord, objecting to the Proof of Claim and asserting additional claims against the Landlord as more fully described in the complaint. The Adversary is proceeding under case number 21-03029-hcm.

K. The Parties desire to enter into this First Amendment in order to settle, compromise, and resolve these and other matters affecting the Lease that have arisen directly or indirectly from the Pandemic, in the Bankruptcy Case, and in the Adversary. The Corporate Guarantor consents to such amendment.

**Agreement**

    Now, therefore, in exchange for good and valuable consideration, the receipt and sufficiency of which is acknowledged and accepted, Landlord and Tenant hereby amend the Lease as follows, and the Corporate Guarantor consents to such amendments:

1. **Conditions Precedent**. Landlord and Tenant acknowledge and agree that the rights and obligations contained in this First Amendment are contingent upon the following:

   A. ***Consent by Landlord's Lender***. Landlord and Tenant acknowledge and agree that the rights and obligations contained in this First Amendment are contingent upon the consent of Landlord's lender, Wells Fargo Bank N.A., as Trustee for the Benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C8, Commercial Mortgage Pass-Through Certificates Series 2018-C8 c/o Midland Loan Services, a division of PNC Bank, N.A. ("***Midland***"), 10851 Mastin Boulevard, Overland Park Kansas 66210 (the "***Landlord's Lender***"). Landlord shall provide Tenant with documentation of such consent no later than fifteen (15) days after mutual execution of this First Amendment.

   B. ***Bankruptcy Court Approval***. Landlord and Tenant acknowledge and agree that the rights and obligations contained in this First Amendment are contingent upon entry of an order (or orders) by the Bankruptcy Court (i) approving the terms of this First Amendment and authorizing Tenant to assume the Lease as modified and (ii) dismissing or closing the Adversary (the "***Approval Order***"). As soon as practicable after receipt of the consent of Landlord's Lender, Tenant shall cause its attorney to file the appropriate motion(s) and draft order(s) with the Bankruptcy Court.

   C. If the foregoing conditions are not satisfied on or before September 15, 2022, the terms of this First Amendment shall be null and void, and the Parties will retain all their respective rights and claims.

2. **First Amendment Effective Date**. This First Amendment shall become effective as of the date (the ***"Effective Date"***) upon which all of the conditions precedent set forth in Section 1 herein have been satisfied.

3. **First Amendment Controls**. In the event of any conflict between the terms of the Lease and the terms of this First Amendment, the terms of this First Amendment shall control. In all other respects, the Lease shall continue in full force and effect.

4. **Rent Settlement.**

   A. ***Rent Settlement Amount***. The Parties agree that, for the Force Majeure Period and the months of July, August, and September 2021, that the only Rent and other ancillary charges described in the Lease owed by Tenant, shall be the sum of $800,538.73 (the "***Rent Settlement Amount***"). The Parties further agree that payment of the Rent Settlement Amount shall constitute full and

final satisfaction of all Rent amounts owed for these periods. The Landlord hereby releases any and all claims to any further Rent amounts owed for these periods upon full payment of the Rent Settlement Amount.

B. *Payment of Rent Settlement Amount.* The Parties agree that the Rent Settlement Amount is paid or payable as follows:

(1) *Partial Rent Payment.* The Parties acknowledge and agree that the Partial Rent Payment already received by Landlord totaling $30,000.00 is applicable toward the Rent Settlement Amount.

(2) *PG Payment.* The Parties acknowledge and agree that the PG Payment already received by Landlord totaling $255,538.73 is applicable toward the Rent Settlement Amount.

(3) *Remaining Rent Settlement Payment.* Within 15 days of the Effective Date, Tenant shall pay to Landlord's Lender c/o Midland the additional sum of $515,000.00 in full and final satisfaction of all Rent amounts owed under the Lease for (a) the Force Majeure Period; and (b) the months of July, August, and September 2021.

5. **Utilities Reimbursement.** Landlord estimates that it paid approximately $35,000.00 to PNM (Public Service Company of New Mexico) and New Mexico Natural Gas Company to maintain electric power and natural gas service (the ***"Utilities"***) at the Premises during a portion of the Force Majeure Period. In addition to the Rent Settlement Amount, Tenant shall reimburse Landlord, and shall remit such reimbursement to Landlord's Lender c/o Midland, for its actual out-of-pocket costs not to exceed $35,000.00, excluding refundable deposits, for providing the Utilities within 15 days of the later of the Effective Date or production by Landlord of commercially reasonable documentation verifying the actual amounts paid by Landlord.

6. **IRB Reimbursement**. In addition to the Rent Settlement Amount, within 15 days of the First Amendment Effective Date, Tenant shall pay to Landlord the sum of $50,000.00 to reimburse Landlord and shall remit such reimbursement to Landlord's Lender c/o Midland, for its costs and expenses associated with obtaining an industrial revenue bond for the Center (the "***IRB***"). Thereupon, Landlord agrees that it will no longer make any further payment demands on Tenant relating to the IRB and will not seek to pass through charges to attributable to the IRB as Rent. Landlord further agrees to cooperate with Tenant's efforts to reduce its business personal property taxes arising as a result of the IRB's issuance and designation of certain elements of the Permitted Use as manufacturing,

provided that Landlord shall not be required to incur any costs or expenses associated with such cooperation.

7. **Tenant Improvements.** Tenant desires to make further improvements to the Premises, which are intended to increase the potential gross revenues from its Permitted Use and generally enhance the value of the Premises as a dine-in movie theater throughout the extended non-cancelable Term, as amended by Section 8 below. The Parties acknowledge such further improvements are to their mutual benefit.

   A. *Scope of Work*. Tenant has identified four potential improvement projects as follows: (1) construction of a "mini-cinema," with a capacity for approximately 18-30 patrons, which will be Auditorium #9 of the Premises (the "***Priority Project***"); (2) remodeling of the lobby bar area to facilitate Tenant's current concept prototype of "The Pub;" (3) alterations of elements of selected auditoriums (platforms, risers and steps) necessary for the installation of additional electric reclining seats above the auditorium cross-aisle; and (4) construction of a partially enclosed outdoor food and beverage service area in the area designated for such use on Tenant's original plan set (but heretofore not constructed). The foregoing items 2, 3 and 4 are referred to as "***Secondary Projects***." The Priority Project and the Secondary Projects are further described for illustrative purposes in Exhibit A. Tenant shall endeavor with due diligence to design the Priority Project in accordance with the International Building Code (the "***IBC***") edition then applicable to Bernalillo County, to obtain Landlord's approval of the Alteration, not to be unreasonably withheld, conditioned or delayed by Landlord, and to obtain a building permit. In the event the Priority Project requires material variances from its design in order to obtain a building permit, or Landlord reasonably disapproves the Priority Project or Tenant in its sole discretion determines the Priority Project is either technically or economically infeasible, then Tenant may select one or more of the Secondary Projects. Any Secondary Project so selected shall likewise be designed in accordance with the IBC then applicable, be subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed, and submitted for building permit review. Those project(s) selected by Tenant, approved by Landlord and permitted by Bernalillo County will be designated as the "***Approved Alterations***." To the extent applicable, Paragraph 2 of Exhibit B-I of the Lease shall govern Tenant's execution of the Approved Alterations.

   B. ***Tenant Improvement Reserve Deposit.*** In addition to the Rent Settlement Amount, and in order to secure Tenant's obligation to execute the Approved Alterations, within 15 days of the Effective Date, Tenant shall deposit

with Landlord's Lender, c/o Midland, the sum of $200,000.00 (the "**TI Reserve**"), to be held in Landlord's "Tenant Improvement and Leasing Commission Reserve" maintained under the control of Landlord's Lender.

C. *Reimbursement of Tenant Costs.* Tenant will be reimbursed for the out-of-pocket cost incurred to execute the Approved Alterations (the "TI Reimbursement"). Landlord may but is not required to use the TI Reserve to fund the reimbursement. Tenant shall submit a single TI Reimbursement request no earlier than March 7, 2023, which request shall include, as applicable, the documentation required by Paragraph 5 of Exhibit B-I of the Lease. Upon receipt of Tenant's request and such documentation, Landlord shall have thirty days to remit the TI Reimbursement, or to advise Tenant of any additional documentation customary in the industry as reasonably required by Landlord's Lender. In the event of additional documentation requirements, Landlord shall have thirty days from the date Tenant delivers the documentation required by Landlord's Lender's to remit the TI Reimbursement. In the event Landlord does not remit the TI Reimbursement as herein provided, Tenant may offset the unremitted amount against future Rent of its choosing.

8. **Extension of Non-Cancelable Lease Term.** Sections 18.11(B) and 18.11(C) of the Lease each provide an option whereunder Tenant has the right to cancel the Lease as of the end of the tenth year of the Term, subject to certain conditions and terms. As a material element of the bargain herein, Tenant agrees to waive such cancellation rights, and accordingly extend the non-cancelable Term by sixty (60) months through and including November 30, 2031. Sections 18.11(B) and (C) of the Lease are hereby deleted from the Lease in their entirety. Additionally, Landlord grants Tenant the option to extend the Term for two months (through January 31st of the following year) at no increase in Base Minimum Rent upon delivery to Landlord of written notice exercising such option on or before 180 days prior to the expiration of the Term.

9. **Rent Modifications**.

    A. *Base Minimum Rent*. Section 4.3 of the Lease is hereby deleted in its entirety and replaced as follows:

    "4.3  Base Minimum Rent. Commencing October 1, 2021, on or before the first business day of each and every month of the initial Term, Tenant shall pay to Landlord $68,854.20 as Base Minimum Rent, representing an annualized rent rate of $22.00 multiplied by 37,557 square feet of Rentable Area."

B. *Percentage Rent*. Section 4.9 of the Lease is hereby amended to provide that the applicable percentage used for the calculation of Percentage Rent is increased from five percent (5%) to six percent (6%).

C. *Timing and Manner of Rent Payments*. The following sentence in Section 4.10 of the Lease is hereby deleted:

"In the event that Tenant has not sent (as evidenced by post mark or courier receipt) any installment of Base Minimum Rent by the fifth day following the date such installment is due and Landlord has not received the Base Minimum Rent by the 8th day of the month, Tenant shall pay a late charge equal to 5% of the Base Minimum Rent."

*and replaced by the following*:

"Landlord will provide Tenant with banking information sufficient to enable rent remittances via the Automated Clearinghouse (ACH), Federal Reserve wire transfer system or other generally accepted means of electronic payments, provided there are no fees payable by Landlord to such systems or services or deductions from Tenant's remittance. Tenant shall pay a late charge equal to 5% of the Base Minimum Rent in the event (a) Tenant remits electronically and collected funds are not received by Landlord in its designated bank account on or before the 3rd day of the month (or the first business day thereafter if the 3rd falls on a weekend or banking holiday) or (b) Tenant remits by check and its check is not sent (as evidenced by post mark or courier receipt) by the first business day of the month.

10. **Security Deposit**. Section 3.1 of the Lease is deleted in its entirety and replaced as follows:

"Tenant has deposited with Landlord the amount of $141,166.67 (the "Deposit"). The Deposit shall be applied against Rent for months 120 (November 2026) and 121 (December 2026) of the Lease. If subsequent to the Effective Date of the First Amendment Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of Rent, or if an Event of Default occurs, Landlord may use, apply or retain all or any part of the Deposit for the payment of any Rent or any other sums due and payable under the terms of this Lease or for the payment of any or all other amounts which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any and all other losses, costs or damages which Landlord may suffer by reason of Tenant's default or the occurrence of an Event of Default. If any portion of the Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the Deposit to its original amount. Landlord shall not pay interest to Tenant on the Deposit. In the event the Center is sold, the security deposit will be transferred to the new owner and Landlord shall have no further

liability therefor if the new owner assumes Landlord's obligations under this Lease."

11. **Miscellaneous**.

    A. All the covenants of the Lease, as amended by this First Amendment, are binding upon and inure to the benefit of the Parties and their respective successors and assigns.

    B. All capitalized terms used in—but not defined by—this First Amendment bear the meanings ascribed to them in the Lease.

    C. This First Amendment may be executed in one or more counterparts, each of which may be assembled so as to constitute one original document. Electronic signatures rendered through "Adobe Acrobat Sign" or "DocuSign" shall constitute originals.

    D. Tenant utilizes a 52/53 week fiscal year ending the Thursday closest to December 31st consisting of 12 fiscal periods of either 4 or 5 weeks each (six weeks for "December" of a 53-week year). Tenant may use its fiscal year and fiscal periods for purposes of calculating Gross Percentage Rent applicable to calendar years and months.

    E. In the event any provision of this First Amendment be deemed invalid or unenforceable by law or a court of competent jurisdiction, the unenforceable provision shall be deemed stricken from this First Amendment and the remaining terms and conditions of this First Amendment and the Lease shall remain of full force and effect.

[Signature Page Follows]

***In witness whereof***, the parties to this First Amendment to Lease have executed this Amendment or caused it to be executed on its behalf by its duly authorized representatives, as of the date first above written.

**Landlord:**

**Village @ La Orilla, LLC,**
a Delaware limited liability company,

By: *Philip L. Lindborg*
Philip L. Lindborg (Aug 28, 2022 15:42 MDT)
Philip L. Lindborg
Managing Member

**Tenant:**

**Flix Brewhouse NM LLC,**
a New Mexico limited liability company,

By: Hospitality Investors Inc.
a Texas corporation

Its: Manager

By: _____
Allan L. Reagan
President

**Corporate Guarantor**

**Flix Entertainment LLC,**
a Texas limited liability company,

By: _____
Allan L. Reagan
CEO

*EXHIBIT A*
DESCRIPTION OF POTENTIAL TENANT IMPROVEMENT PROJECTS

A. PRIORITY PROJECT – 9th CINEMA AUDITORIUM ("*#9*")

Tenant's newest prototype cinemas all consist of nine screens, and Flix has retrofitted two other existing locations to nine screens, which management believes is optimal for higher volume units such as Albuquerque. The 9th screen, although typically low in seating capacity has an outsize impact for reasons including, but not limited to: (a) frees up larger houses for more productive use that otherwise would be required to play holdover titles with dwindling attendance due to studio contracts; (b) enables the theater to play more independent and niche films that don't draw large audiences; and (c) more affordable for rentals by smaller groups, that often want to select titles not on the current first-run rotation. So called mini-cinemas, seating from 6 to 36 patrons, first became popular in Europe and Southeast Asia, and have since attracted a functional vendor support ecosystem. #9 will seat between 18 to 30 patrons, depending on seat selection and layout, and use a laser projector purpose-built for small houses. Regardless of selection, the seating in #9 will be perceived by guests as "premium."

Auditoriums in sprinklered buildings with fewer than 49 seats only require a single entry/exit. The space within the Premises intended for #9 is approximately defined as the area in the current lobby banquette seating area south of the north windows, west of the brewery wall, east of the lobby restroom separation partition wall with the main south wall generally aligned with the south brewery wall, with the vomitory extending beyond.

Among other key design choices will be treatment of the exterior glass (and, possibly, a portion of the interior brewery glass as the auditorium walls will extend nearly flush with the glass). Subject to Landlord approval and applicable local governmental ordinances, if any, Flix intends to propose an opaque window tint to hide the interior gypsum board wall structure, with graphics visible from the exterior to add design interest to the building.

B. SECONDARY PROJECT – UPGRADE TO NEW PUB PROTOTYPE

The original lobby design, with bar and associated seating on one side of the lobby separated from traditional restaurant banquettes on the other side of the lobby by the main traffic concourse between the auditoriums and front door has proven to be deeply flawed in terms of both generating standalone food and beverage sales from non-ticketed patrons and in the ability of staff to service the few guests who do utilize the north side of the lobby. Flix has learned that concentrating lobby energy into a single space, rather than the current bifurcated layout results in a more engaging guest experience and higher sales. The Primary Project, if built, would eliminate this less productive north side space. The high-energy and more heavily contented New Pub Prototype features much more soft seating, eliminating many of the restaurant height tables, and integrates into the space a variety of classic amusements customized to the preferences of the locale and to adult sensibilities such as electronic darts, vintage pinball and video games, shuffleboard, and various board games. The objective is to increase dwell time, beverage sales and food sales of lighter bites.

An edited version of the New Pub Prototype could be created in connection with the Priority Project.

C. SECONDARY PROJECT – PREPARE AUDITORIUM RISERS FOR RECLINER CONVERSION

At this location, seating in the "stadium" (rows above the cross-aisle) are generally luxury rockers or fixed seating, and below the cross-aisle ("lower bowl") are electric recliners. Presently, this hybrid approach is working acceptably despite almost all the direct competition being 100% reclined, but as seating ages replacement with electric recliners makes sense from a guest satisfaction and retention perspective. The Company has currently designed the auditorium modifications necessary to convert the current stadium layout at the Premises to 100% recliners in two locations, one of which has been built and is now in service. For that first location, Des Moines, the construction cost exclusive of furnishings and equipment was over $600,000. While this project is not likely to occur in the probable planning horizon for utilizing the TI Reserve, it could be accelerated either because of business requirements or the sequencing and budgeting of other potential projects, and accordingly has been described in this exhibit.

D. SECONDARY PROJECT – CREATE LICENSED OUTDOOR PATIO AREA

The Premises does not currently have an outdoor area licensed for the service of alcoholic beverages. Although there was initially an area designated for such, there was no plan or design and consequently the space was not utilized. It is currently being used as a receiving / staging area for kitchen operations. The original general contractor subsequently proposed a design that likewise was never built. The proposed location has a captivating east-facing view of the Sandia Mountains, particularly impressive at sunset when the rays bounce off the high peaks.

2

# For Signature: FB NM (ABQ) - 1st Amendment Settlement 8.25.22 (70252296.1)

Final Audit Report 2022-08-28

| | |
|---|---|
| Created: | 2022-08-26 |
| By: | Lisa LaBerge (leasing@skyridgeplaza.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtKvmF2abbhbm1xJO04aUk7qXdHr822rx |

## "For Signature: FB NM (ABQ) - 1st Amendment Settlement 8.25.22 (70252296.1)" History

- Document created by Lisa LaBerge (leasing@skyridgeplaza.com)
  2022-08-26 - 5:21:17 PM GMT- IP address: 12.157.102.98

- Document emailed to allan.reagan@flixbrewhouse.com for signature
  2022-08-26 - 5:21:56 PM GMT

- Email viewed by allan.reagan@flixbrewhouse.com
  2022-08-26 - 5:29:34 PM GMT- IP address: 12.157.102.98

- Signer allan.reagan@flixbrewhouse.com entered name at signing as Allan L. Reagan
  2022-08-26 - 5:30:54 PM GMT- IP address: 12.157.102.98

- Document e-signed by Allan L. Reagan (allan.reagan@flixbrewhouse.com)
  Signature Date: 2022-08-26 - 5:30:56 PM GMT - Time Source: server- IP address: 12.157.102.98

- Document emailed to phillindborg@comcast.net for signature
  2022-08-26 - 5:30:58 PM GMT

- Email viewed by phillindborg@comcast.net
  2022-08-26 - 7:33:24 PM GMT- IP address: 104.28.50.165

- Email viewed by phillindborg@comcast.net
  2022-08-27 - 7:27:30 PM GMT- IP address: 104.28.85.157

- Email viewed by phillindborg@comcast.net
  2022-08-28 - 6:14:24 PM GMT- IP address: 104.28.111.144

- Signer phillindborg@comcast.net entered name at signing as Philip L. Lindborg
  2022-08-28 - 9:42:52 PM GMT- IP address: 98.48.77.220


Adobe Acrobat Sign

Document e-signed by Philip L. Lindborg (phillindborg@comcast.net)
Signature Date: 2022-08-28 - 9:42:54 PM GMT - Time Source: server- IP address: 98.48.77.220

Agreement completed.
2022-08-28 - 9:42:54 PM GMT

Adobe Acrobat Sign